**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CASE NO.    1:21-CR-83-TSE** |
| | **:** | |
| **MAJED TALAT HAJBEH** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**MEMORANDUM IN SUPPORT OF MOTION TO
SUPPRESS DEFENDANT'S STATEMENTS**

Defendant Majed Talat Hajbeh, by counsel, respectfully submits this memorandum in support of his motion to suppress his statements obtained by Federal Bureau of Investigations agents, and states the following in support thereof:

**BACKGROUND**

On Tuesday, June 23, 2020, a search team consisting of at least 50 FBI Special Agents, Task Force Officers, and support personnel, in addition to law enforcement personnel from multiple other law enforcement agencies, including Virginia State Police, descended on the family home of Majed Hajbeh in Woodbridge, Virginia to execute a search and seizure warrant issued by this Court on June 17, 2020 for evidence related to the possession of child pornography.  The breach and search teams arrived in a large convoy of official government vehicles that surrounded the entirety of Mr. Hajbeh's neighborhood.  The agents closed off all entrances and exits to the neighborhood and set up a checkpoint to control all access to it.  The time was 6:00 AM, and Mr. Hajbeh's wife, 19-year-old son, and 11- and 12-year-old children, were all asleep.  Dozens of FBI Special Agents (SAs) and Task Force Officers (TFOs) immediately exited their vehicles and quickly approached the front door.

1

The TFOs and SAs approached the front door in full military-style tactical gear with long guns drawn and aimed at the Hajbeh home, while additional agents surrounded the perimeter of the home. The lead TFO held a large, black shield while another held a battering ram. One agent immediately covered the Nest camera by the front door with a blue sticky note, preventing any further video recording of the removal of Mr. Hajbeh and his family from the home and the entry of the agents into the home. *See* Exhibit 1 (DVD containing Nest footage).[1] The agents loudly knocked the front door while yelling "FBI with a search warrant, come to the front door!" They repeated this a few times, yelling "FBI, come to the front door!" Within approximately 35 seconds of the initial knock, the agents could be heard on the Nest recording saying that this is a "reasonable time" as they discussed breaching the front door. Approximately 55 seconds after the initial knock, Mr. Hajbeh opened the front door.

The moment Mr. Hajbeh opened the door, multiple agents trained their long guns directly at him, while one agent aggressively yelled: "Hey! Majed, put your hands up!" Mr. Hajbeh immediately exclaimed "wow wow wow" as he first saw the long guns aimed at him and the large FBI presence at his door. The agent loudly and repeatedly commanded him to step to his left and put his hands up. Agents also yelled at his 19-year-old son, who was wearing nothing but boxer briefs, to drop the robe he held in his hand as they trained their guns on him as well.

An agent began yelling at Mr. Hajbeh, who could not understand the agents' instructions due to his poor English language skills and the shock of the situation, to stand up and come to the front door with his back to the agents. The agents yelled at his son to "stay still," while yelling at Mr. Hajbeh: "Majed! Stop, get down on your knees. Stay still. Majed, get down on your knees

---

[1] A DVD containing the footage will be provided to the Court in chambers with a copy to the Government.

please!" When it became apparent that Mr. Hajbeh was not understanding the agents' commands, the agent told his son to "help him out, tell him to get on his knees." His son then told him in Arabic to get down on the floor on his knees, which Mr. Hajbeh immediately did. The agent then ordered Mr. Hajbeh to stay still and keep his hands where they were and keep them visible.

Mr. Hajbeh was instantly placed in handcuffs and removed by the agents from the home while still barefoot. At least two agents held him by the arms and walked him to the side of the home, where he was made to stand, handcuffed, while facing an external wall of the house. Mr. Hajbeh immediately saw that the home was surrounded by armed law enforcement. Any time he turned around or looked anywhere but the wall, he was ordered to look straight at the wall and not look towards the agents. He was held in this way for approximately fifteen to thirty minutes.

Meanwhile, agents at the front door told Mr. Hajbeh's 19-year-old to "tell your family we have a search warrant. We have a warrant to search the house." Mr. Hajbeh's son translated this into Arabic. The agents ordered everyone in the home to come to the front door. When Mr. Hajbeh's wife, Najwa Abu Al Hija, approached and asked what was going on, an agent yelled at her to stay back and wait. The agents told Ms. Abu Al Hija to bring her two minor children, ages 11 and 12, outside. When Ms. Abu Al Hija attempted to take her shoes, an agent pointed a gun at her and yelled "Hey! Hey! Hey! No shoes. We'll get your shoes later. I need you out of the house." When she requested to use a phone, she was told she may not and that she needed to leave the house. She was then ordered to turn around and placed in handcuffs and removed from the home, as was her 19-year-old son, who was still wearing nothing but boxers. All family members were escorted outside without shoes, and they were not provided shoes until hours later.

From that moment on, every movement of Mr. Hajbeh and his family members was completely controlled and directed by the agents. They were walked out and directed to specific

3

locations outside the home, and Mr. Hajbeh was separated from the rest of his family. Even the two minor children were escorted, uncuffed, by two FBI agents, who then took them to where Ms. Abu Al Hija had been escorted.   She and her adult son remained handcuffed outside for approximately one hour before they were finally uncuffed.

The agents then conducted a sweep of the home during which they yelled loudly "FBI! Come to the front door!"  When they encountered two locked doors, one in the basement and one on the ground floor, the agents destroyed the two wooden doors.  At around 6:20 AM, the breach team was done clearing the home, and at approximately 6:32 AM, the search team entered and began searching every part of the home. Photos subsequently taken after the agents left show the mess they left in virtually every room of the house.  *See* Exhibit 2 (collection of photographs).

Once the home was cleared, two agents walked Mr. Hajbeh from the right side of the home to the outside basement door and directed him inside the basement.  He could see as he approached the basement door that the home was still fully surrounded by armed agents.   Once inside the basement, the agents removed his handcuffs and directed him to sit on a seat near the door, while the two agents sat across from him.  The basement door was closed.  For the remainder of the time in which Mr. Hajbeh was interrogated, he was kept isolated from the rest of his family, including his other adult children who later arrived but were prevented from accessing the home.

Although it appears that Mr. Hajbeh was questioned prior to the audio recorder being activated, the agents turned on the recorder at some point and told Mr. Hajbeh in English that he was free to leave, a statement they later repeated during their questioning of him.  But for the next two and a half hours of his interrogation, Mr. Hajbeh was never allowed to move freely.  When he requested water, he was told to wait for one of the agents to bring it to him.  When he requested his reading glasses, he had to wait for an agent to bring them.  When they questioned him about

one of his cellphones while one of the agents held it for him to see, he was told not to touch the phone.  Just like with his other family members, his every movement was controlled and directed by the agents for the duration of his questioning.

At approximately 7:40 AM, four of Mr. Hajbeh's adult children, as well as his brother, arrived while the home was still being searched and Mr. Hajbeh was being questioned by the agents in the basement.  One of them asked SA Kelly McLeod to speak to her father's attorney and handed her a cellphone with the attorney on the line.  The attorney advised SA McLeod that he represented Mr. Hajbeh and requested that the agents on scene advise Mr. Hajbeh that his attorneys wish to speak with him.  At no time was this information relayed to Mr. Hajbeh.  When Mr. Hajbeh's attorney arrived on scene later in the morning, he was stopped at the checkpoint set up at the entrance to the neighborhood and was not allowed access to his client.

What is more, despite the agents knowing that Mr. Hajbeh's English language abilities are poor, which was demonstrated by his inability to understand the agents' simple instructions to him during his initial encounter with them at the doorway, necessitating his son's intervention to interpret for him, the two agents who questioned Mr. Hajbeh never made an Arabic interpreter available during his questioning and never offered to do so. That is despite the fact that the fifty-plus team of FBI and other law enforcement personnel on scene included an Arabic linguist and an Arabic interpreter.  In fact, when other agents questioned Ms. Abu Al Hija outside the home with the help of one of the Arabic interpreters, Ms. Abu Al Hija specifically asked them to send the interpreter to her husband because he does not speak English well. They never did so.

At no time was Mr. Hajbeh advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  He was questioned for approximately two and a half hours, during which the agents threatened to talk to every member of his family and members of his community and let them all

5

know that he was being investigated for child pornography offenses.  Towards the end of his

questioning the agents asked if he would submit to a polygraph examination.  Mr. Hajbeh asked if

they wanted to "photograph" him, and, apparently mishearing his question, the agents said yes.

Mr. Hajbeh agreed.  The agents told him that he could drive his own car to the Prince William

County Police Department and that they would drive in separate cars.  Even on the way to the

police station, Mr. Hajbeh was escorted by FBI agents with one car leading the way and another

car following immediately behind him.  Once he understood that the agents were asking him to

undergo a polygraph and not to take a photograph, he declined after having waited at the station

for approximately forty-five minutes.  It was not until that point that Mr. Hajbeh was free to go

and was permitted to drive away without any law enforcement escort.

## ARGUMENT

Mr. Hajbeh's statements should be suppressed because they were obtained in violation of

his Fifth Amendment rights as articulated in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its

progeny. Notwithstanding the assertions by the Special Agents that Mr. Hajbeh was "free to go"

and was not "under arrest," everything about the way he was detained supports that he was in

custody and his questioning was custodial in nature, thus triggering law enforcement's obligation

to advise him of his *Miranda* rights.

"A person subjected to custodial interrogation is entitled to the procedural safeguards

prescribed by Miranda." *United States v. Leshuk*, 65 F.3d 1105, 1110 (4th Cir. 1995) (citations

omitted). The Supreme Court has defined "custodial interrogation" as "questioning initiated by

law enforcement officers after a person has been taken into custody or otherwise deprived of his

freedom of action in any significant way." *Miranda*, 384 U.S. at 444 (emphasis added). Thus, "any

statements a suspect makes during custodial interrogation are inadmissible in the prosecution's

case in chief unless prior *Miranda* warnings have been given." *Leshuk*, 65 F.3d at 1110; *see also*

*Berkemer v. McCarty*, 468 U.S. 420, 434-35 (1984).

Although the burden of proof is initially on the accused who seeks to suppress statements,

*United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981), once the accused establishes a basis

for his suppression motion the burden shifts to the Government to prove by a preponderance of the

evidence that the defendant's statements were not the product of custodial interrogation without

*Miranda* warnings. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Matlock*, 415

U.S. 164 (1974).

In determining whether an individual was "in custody," the Court must evaluate the totality

of the circumstances of the questioning in order to determine if "a reasonable person would have

felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*,

516 U.S. 99, 112 (1995). The Court must therefore determine "how a reasonable person in the

position of the individual being questioned would gauge the breadth of his or her 'freedom of

action.'" *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (internal quotation and

citation omitted).

Factors held by the Fourth Circuit to be relevant to whether an interrogation is custodial

include "the time, place and purpose of the encounter, the words used by the officer, the officer's

tone of voice and general demeanor, the presence of multiple officers, the potential display of a

weapon by an officer, and whether there was any physical contact between the officer and the

defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) (quoting *United States v.*

*Weaver*, 282 F.3d 302, 312 (4th Cir. 2002)) (internal quotation marks omitted). Additional relevant

factors also include the individual's isolation and separation from his family and any physical

restrictions imposed by law enforcement. *United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993); *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990).

All factors relevant to the custody inquiry unequivocally support that Mr. Hajbeh was in custody for purposes of *Miranda* and that no reasonable person in his position would have felt free to leave and terminate his interrogation at any time.

**Time, place, and purpose of the encounter.** The agents timed the execution of the search warrant to begin at 6 AM, during the very early morning hours while the Hajbeh family was largely asleep. While the location of Mr. Hajbeh's questioning was the basement of his home, there is no question that the entirety of the home, in fact, the entirety of the neighborhood, was under the full control of dozens of armed federal agents and state police officers for the duration of Mr. Hajbeh's questioning. The purpose of the encounter – the execution of a federal search warrant – also further supports the custodial nature of the encounter. The Hajbeh home and neighborhood were under the authority and complete physical control of the agents, who not only restricted Mr. Hajbeh's movements, but also restricted the movements of his family members and made it clear from the very beginning that no one was to make a single move without the permission or direction of an agent—not even to put on a pair of shoes or grab a pair of eyeglasses. It is hard to conceive of a more forceful and coercive law enforcement presence than the one that descended on Mr. Hajbeh's home and neighborhood on June 23, 2020.

**The words used by the agents and the agents' tone and demeanor.** From the moment the agents approached the front door, they began loudly knocking on the door and shouting commands at Mr. Hajbeh: "FBI with a search warrant, come to the front door!" When he did not open the door fast enough – meaning within less than a minute – the agents threatened to breach the door by force. The implication was clear from that moment forward: he was to respond as

commanded and do so immediately.  As soon as Mr. Hajbeh opened the front door and was met

with multiple long guns aimed at him, he faced a barrage of forceful commands shouted at him

that he could not understand without the help of his son's interpretation.  There can be little doubt

about the level of fear Mr. Hajbeh felt in that moment, knowing that the agents had guns aimed at

him and that a single wrong move could result in his shooting, all while he could not understand

what it was they were directing him to do.  His exclamation of "wow wow wow," which is audible

in the Nest recording, demonstrates the level of fear he experienced in that amount, a fear that any

reasonable person would have felt.  There is likewise little doubt about the aggressive manner in

which the agents handcuffed him immediately and physically removed him from the home while

barefoot.

From the beginning of his encounter with law enforcement at the doorway, Mr. Hajbeh's

every movement was subject to the control of the agents. They handcuffed him, escorted him to

the side of the house while holding his arms, made him face the wall, ordered him not to look

behind him, and did not permit him to move an inch without their direction.  Even after the home

was cleared, Mr. Hajbeh was led in handcuffs to the basement, and it was only there that he was

uncuffed and directed to sit down.

Although the agents eventually told Mr. Hajbeh as they began his questioning that he was

not under arrest and is free to go, that statement does little to nothing to override the overwhelming

circumstances that made clear to Mr. Hajbeh, and would have done the same to any reasonable

person, that he was in fact not free to go.  While this statement by the agents may be considered

as one factor in the Court's inquiry, it certainly is not dispositive and does not, standing alone,

suffice to support a holding that this encounter was voluntary or non-custodial.  *See United States*

*v. Colonna*, 511 F.3d 431, 435-36 (4th Cir. 2007) (holding that informing a suspect that he is not

under arrest is a factor, but insufficient standing alone, to sustain a ruling that the questioning was non-custodial); *Hargrove*, 625 F.3d at 180 (statement that suspect is "free to leave" "is not 'talismanic' or sufficient in and of itself to show a lack of custody."). Rather, the Court must weigh this statement against the overwhelming evidence that otherwise clearly told Mr. Hajbeh that he was in custody for the duration of his questioning.

Moreover, the Government cannot benefit in this inquiry from the agents' belated statement to Mr. Hajbeh that he was free to go considering the agents' decision not to make an Arabic interpreter available for him, despite their availability on the scene. Telling an individual who is not fluent in English and who requires an interpreter that he is "free to go" does not carry much weight. And in any case, the agents' actions clearly contradicted their words: even after telling Mr. Hajbeh that he was not under arrest, the agents continued to control Mr. Hajbeh's movements in every way, thus undermining any sense that their words meant anything.

**The presence of multiple agents and the potential display of weapons.** According to law enforcement reports, at least 50 named law enforcement officials were involved in the execution of the search warrant on Mr. Hajbeh's home and his detention. There were FBI Special Agents, Task Force Officers, Virginia State Police Troopers, agents from other law enforcement agencies, and numerous support personnel. The Nest camera footage depicts the militaristic way in which the agents descended on the home, guns drawn, including long guns, wearing tactical gear, and carrying a battering ram and a large black shield. It is a scene reminiscent of a military raid on a high-value target. Armed officers could be seen immediately surrounding the perimeter of the home, while a wider perimeter was closed off by the FBI around the entire neighborhood. The sheer amount of manpower, weapons, government vehicles, and tactical gear that was deployed to execute this search warrant – a search warrant for child pornography that is – was

10

shocking and unquestionably extremely coercive.  And there is no doubt that this aggressive law enforcement presence had its intended effect: Mr. Hajbeh can be heard audibly exclaiming in shock the moment he opens the front door and sees the guns pointed at him. Nothing that occurred between that first moment and the time of the interrogation in the basement served to in any way dissipate the coercive environment in which Mr. Hajbeh found himself.

**Whether there was any physical contact between the defendant and law enforcement.** As described above, Mr. Hajbeh was physically restrained by the agents, handcuffed, and physically moved to the side of the home as two agents held his arms.  He had at least two agents by his side at all times and was made to stand handcuffed and facing the wall for a period of time. He was then again physically escorted to the basement as agents held his arms and walked him to the door. In other words, not only was he psychologically in a state in which no reasonable person would feel free to leave, but he was also physically restrained.

**Isolation of the individual and physical restrictions.**  Mr. Hajbeh was immediately isolated from his family the moment he was removed from the home.  The agents intentionally took him to a separate side of the home than the rest of his family, and for the duration of his questioning, he was not allowed access to his family, and his family was not permitted access to him.  Even when his adult children and his brother arrived, they were not allowed to enter the home.  Nor was his attorney.  His wife and his three children who were in the home during the arrival of the FBI were kept outside and away from him the entire time.  And when his attorney called and asked that the agents tell Mr. Hajbeh that he wanted him to call him, the agents refused to pass along the message, and they physically prevented the attorney from reaching the home when he arrived at the entrance of the neighborhood.  Simply put, after subjecting Mr. Hajbeh to the psychological shock of their violent home entry and his forceful detention, they did everything

11

to keep Mr. Hajbeh isolated from all others for the duration of his questioning, further compounding the coercive environment in which any reasonable person would have felt detained.

In addition, Mr. Hajbeh continued to be subject to physical restrictions during the interrogation, including not being able to touch his phone, get himself a bottle of water, or retrieve his own reading glasses.  And of course, his home was simultaneously swarming with agents searching every inch of the house, meaning he *wasn't* free to access any part of his home except the seat in the basement to which he was directed by the agents.  Nothing about these circumstances suggests to a reasonable person that he can simply walk away or end his questioning, particularly one speaking to FBI agents without the benefit of an interpreter that he clearly needed.

Under these circumstances, the Court must then determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Hargrove*, 625 F.3d at 178. Certainly, a reasonable person would not feel free to walk away or to refuse to comply with the directives of the agents under these compelling circumstances and after being violently roused in the early morning hours.

A review of controlling and persuasive authority on the issue compels the conclusion that Mr. Hajbeh's questioning on June 23, 2020 was custodial. In *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013), a team of 15-30 state and federal law enforcement officers descended on the defendant's home around 9 am, banging loudly on the door and yelling "open the door." *Id.* at 280. They were allowed in by the defendant's aunt and proceeded to enter with guns drawn, finding the defendant asleep in his bed and waking him. *Id.* They yelled at him to "get up. . . get out of bed," and to show his hands. *Id.* An officer held him by the arm and walked him out to the front lawn, where he and his family were kept outside for some time in the cold. *Id.* When they were allowed back into the home they were restricted to one part of the house as officers searched the rest. *Id.*

Hashime was not permitted to use the bathroom until it was "cleared." *Id.* He was escorted by two officers to the basement to be questioned. *Id.* at 281. At the beginning of his interrogation officers told Hashime he did not have to answer their questions and could leave at any time. *Id.* He was not Mirandized until over two hours into his questioning. *Id.*

Reversing the district court's denial of Hashime's suppression motion, the Fourth Circuit held that no reasonable person under these circumstances would have felt free to leave, notwithstanding the statement by the agent at the beginning of the questioning that Hashime was free to leave and did not have to answer any questions, and despite the fact that he was given multiple breaks during his questioning. *Id.* at 284. Rejecting the Government's argument that the location being the defendant's home made it "less coercive," the court countered that "[a] suspect 'may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.'" *Id.* (quoting *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008)). The court likewise rejected the Government's argument that the cooperative nature of Hashime during his questioning demonstrates that it was not custodial. *Id.* The court noted that Hashime was indeed cooperative, admitting to downloading child pornography and stating "I want to help you," and that "I love helping cops. I've always loved cops." *Id.* But the court found that "[w]hatever the nature of Hashime's tone and demeanor, it is not dispositive here of the custodial inquiry. As the Supreme Court has emphasized, the test for whether an interrogation was custodial is an objective one." *Id.* at 285. The court also disagreed with the district court's focus on the calmness and "forthcoming-ness" of Hashime in his questioning. *Id.* "The voluntariness inquiry and the *Miranda* custody inquiry are, however, not one and the same. *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004)). Accordingly, the

13

Fourth Circuit held that Hashime was in custody for purposes of *Miranda*, and law enforcement's

failure to read him his *Miranda* rights rendered his statements inadmissible. *Id.*

The Virginia Court of Appeals, in a persuasive opinion, likewise concluded that when law

enforcement makes a significant show of force in executing a search warrant with many armed

officers securing the home, the circumstances are such that no reasonable person would feel free

to leave. *Wass v. Commonwealth*, 5 Va. App. 27, 34 (1987). In *Wass*, the police specifically told

the defendant that he was not under arrest and was free to leave. *Id.* at 33. However, he was

confronted by at least twelve armed officers, some of them carrying shotguns, his home was

surrounded, and he was ordered to confine his dogs in place during the search. *Id.* at 33-34. The

court concluded: "The record portrays a situation in which the police officers, through an

impressive display of force and manpower, seized control of Wass's private residence and secured

the premises in a manner suggestive of a military maneuver. In our view, the situation is susceptible

of but one interpretation: a reasonable man confronted with this armed display of manpower at his

house, even though earlier told he was not under arrest and was free to leave, could only conclude

that he was in fact not free to leave and was expected to cooperate. The atmosphere was exactly

the type of police dominated environment described in *Miranda*." *Id.* at 34.

In *United States v. Freeman*, 61 F. Supp. 3d (E.D. Va. 2014), twenty-one state and federal

law enforcement officials executed a search warrant at Freeman's home for child pornography.

Some wore police uniforms while others wore tactical gear. At the point of entry, all officers had

service handguns drawn, but none possessed a rifle or long-barreled firearm. Some officers

established a perimeter outside the home.  An officer knocked the door, and when it was opened,

officers rushed into the home yelling.  Officers approached Freeman with handguns drawn and

high-power LED lights directed at him, and all occupants of the home but Freeman were escorted

to the living room, where they were supervised.  The sons were wearing only boxer shorts. At one point Freeman defecated in his shorts and was only allowed to change clothes in front of an agent. He was then escorted to a bedroom, where he was kept separate from his family going forward. He was seated in a chair closest to the bedroom door, and the agents began by telling him "No one is under arrest. You're free to leave at any time."  Freeman was never handcuffed at any time, nor was he threatened. No weapons were drawn during the interrogation. The agents' tone was "cordial and conversational."  The Court concluded that, based on the totality of the circumstances, a reasonable person in Freeman's place would not have felt free to terminate his interrogation and leave.  The Court noted that while certain factors support that the questioning was not custodial (no handcuffs used, conversational tone of the agents, no display of weapons during questioning, and the location was Freeman's home), the Court concluded that those factors were outweighed by the overall coercive circumstances: the presence of twenty-one agents swarming through the house, Freeman's loss of control of his home, the restrictions on his freedom of movement and that of his family, and the initial display of weapons (handguns) during the initial entry.

Comparing the facts of this case to those in *Hashime*, *Wass*, and *Freeman*, and to other cases in which courts have granted motions to suppress due to the custodial nature of the questioning without the benefit of *Miranda* warnings, compels the conclusion that Mr. Hajbeh's questioning was custodial.  The number of law enforcement agents involved in the search of the Hajbeh home, securing its perimeter, blocking off entrances to the neighborhood, and otherwise controlling the entire scene, far exceeds the number of officers in any of the above-cited cases, including *Hashime*.  Indeed, what the court in *Wass* described as an "impressive display of force and manpower"—namely, twelve armed officers with guns drawn, pales in comparison to what Mr. Hajbeh faced the moment he opened his front door.  The aggressive use of multiple long-barrel

15

firearms, which were directly pointed at both Mr. Hajbeh and his family, is far more coercive than the handguns that were drawn by the officers in *Freeman*. And unlike Freeman, Mr. Hajbeh was handcuffed for a period of time and physically removed from the home before being escorted back in – always under the control and supervision of at least two agents. And just like in *Hashime*, the existence of dozens of agents searching every part of the house while Mr. Hajbeh was being interrogated makes it clear that he would not have felt "that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.'" *Hashime*, 734 F.3d at 284.

Simply put, all of the circumstances relevant to the Court's inquiry militate strongly in support of the conclusion that the FBI detained Mr. Hajbeh and that he was "deprived of his freedom of action in [a] significant way." *Miranda*, 384 U.S. at 444. As such, the agents had an obligation to first advise Mr. Hajbeh of his *Miranda* rights, and to do so in a language that he would understand. They chose not to do so. Accordingly, Mr. Hajbeh's statements were obtained in violation of his Fifth Amendment rights, and they must be suppressed.

## CONCLUSION

For the foregoing reasons, and the additional arguments to be presented at such time as counsel may be heard, the Defendant, Majed Talat Hajbeh, by counsel, moves the Court to suppress all statements made by the Defendant on June 23, 2020.

> Respectfully Submitted,
> Majed Talat Hajbeh
> By Counsel

ELSAYED LAW PLLC

16

BY: ____/s/_____
    Muhammad Elsayed
    Virginia Bar No. 86151
    1934 Old Gallows Road
    Suite 350
    Vienna, Virginia 22182
    (703) 884-2636
    (703) 884-2637 (fax)
    me@elsayedlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was filed electronically using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

                                ____/s/_____
                                Muhammad Elsayed
                                Virginia Bar No. 86151
                                Elsayed Law PLLC
                                1934 Old Gallows Road
                                Suite 350
                                Vienna, Virginia 22182
                                (703) 884-2636
                                (703) 884-2637 (fax)
                                me@elsayedlaw.com